UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

WESTERN DIVISION

| | |
|---|---|
| Amber Knautz, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>    - against -<br><br>Walmart Inc.,<br><br>      Defendant | 3:22-cv-50236<br><br>Class Action Complaint<br><br>Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1. Walmart Inc. ("Defendant") manufactures, markets, labels, and sells chocolate caramel coffee whitener identified as a coffee creamer under the Great Value brand ("Product").

## I. DAIRY PRODUCTS AND COFFEE

2. Coffee drinkers often add dairy products, ranging from skim milk to heavy cream, to soften its naturally strong taste.

3. Google Dictionary defines cream as "the thick white or pale yellow fatty liquid which rises to the top when milk is left to stand."

4. Merriam-Webster defines cream as the "yellowish part of milk containing from 18 to about 40 percent butterfat."

5. The Britannica Dictionary defines cream as "the thick part of milk that rises to the top; the part of milk that contains fat."

6. Collins Dictionary defines cream as "a thick yellowish-white liquid taken from milk."

7. Dictionary.com defines cream as "the fatty part of milk, which rises to the surface when the liquid is allowed to stand unless homogenized."

8. The Food and Drug Administration ("FDA") and identical State regulations, define cream as "the liquid milk product high in fat separated from milk, [with] not less than 18 percent milkfat." 21 C.F.R. § 131.3(a).

9. Coffee cream – also called light cream – is a specialized dairy product made for whitening coffee, "which contains not less than 18 percent but less than 30 percent milkfat," with added sweeteners and/or flavorings. 21 C.F.R. § 131.155(a).

## II. NON-DAIRY COFFEE WHITENERS

10. Non-dairy coffee whiteners were introduced in the 1960s.

11. These products distinguished themselves from types of cream made from dairy ingredients.

12. First, they were sold under the generic name, "coffee whiteners."

13. Second, they were stocked in the frozen food sections of grocery stores.

14. In contrast, coffee cream and other dairy products were sold in the refrigerated foods section in the dairy case.

15. Third, the front label of these products prominently disclosed they were not dairy products.

16. Their labels included statements such as "A Vegetable Product – Contains No Milk or Milk Fat," and "To Whiten and Enrich Coffee."

**III.   COFFEE CREAMER WITHOUT CREAM**

17.    The Product is marketed as a "Coffee Creamer," shown through its statement of identity at eye level, on the middle of the label, above the identified flavor of Chocolate Caramel.



18.    The lower right corner contains a yellow seal stating, "Ultra Pasteurized."

19.    "Pasteurized" refers to a process of partial sterilization, typically through heat treatment, that destroys pathogenic microorganisms in certain foods and beverages.

20.    Milk-based beverages are required by law to be pasteurized and are the products most commonly pasteurized.

21.    Consumers associate pasteurization with milk-based beverages because it has always been a requirement that pasteurization is prominently disclose on their front labels, shown on the images of the milk and light cream below.

3



22. By representing the Product with the statements, "Coffee Creamer" and "Ultra Pasteurized," consumers are misled because it lacks cream and dairy ingredients beyond a *de minimis* amount of sodium caseinate, a milk derivative, shown through the ingredient list.

4

**INGREDIENTS:** SUGAR, WATER, SUNFLOWER OIL, CORN SYRUP, LESS THAN 2% OF NATURAL AND ARTIFICIAL FLAVORS, COCOA PROCESSED WITH ALKALI, SODIUM CASEINATE (A MILK DERIVATIVE*), DIPOTASSIUM PHOSPHATE, POLYSORBATE 60, MONO AND DIGLYCERIDES, COLOR ADDED, SODIUM STEAROYL LACTYLATE, CARRAGEENAN, CARAMEL COLOR, RED 40, BLUE 1. *NOT A SOURCE OF LACTOSE.

23. In place of cream, the Product substitutes water and sunflower oil, the second and third ingredients, to reduce costs.

24. Cream is known for its "creamy" taste because milkfat contains hundreds of lactones, aroma compounds which contribute to its taste.

25. The name "coffee creamer" is almost identical to "coffee cream," defined by the FDA as a dairy product.

26. Consumers value cream from dairy ingredients for its nutritive purposes.

27. Research indicates fats in dairy ingredients do not increase the risk of cardiovascular disease or increase cholesterol, in contrast to vegetable oils.

28. Dairy ingredients also contain protein, calcium and vitamins A, D, E, and K, which are absent from refined vegetable oils like sunflower oil.

5

29. Consumers are misled to expect the presence of cream, from dairy ingredients.

30. Defendant makes other representations and omissions with respect to the Product which are false and misleading.

31. Reasonable consumers must and do rely on a company to honestly and lawfully market and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

32. The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

33. Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

34. Had Plaintiff known the truth, she would not have bought the Product or would have paid less for it.

35. As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than $3.68 for 32 FL OZ (946 mL), excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

## Jurisdiction and Venue

36. Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

37. The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

38. Plaintiff Amber Knautz is a citizen of Illinois.

39. Defendant Walmart Inc. is a Delaware corporation with a principal place of business

in Bentonville, Arkansas, Benton County.

40. Plaintiff's citizenship of Illinois is diverse from Defendant's.

41. The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

42. The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold for several years, with the representations described here, at hundreds of stores in the states covered by Plaintiff's proposed classes.

43. The Product is available to consumers from Defendant's stores and website.

44. Venue is in this District because Plaintiff resides in this District and the actions giving rise to the claims occurred within this District.

45. This action is properly assigned to the Western Division of this District because a substantial part of the events or omissions giving rise to these claims occurred in Stephenson County, including Plaintiff's purchase, consumption, and/or use of the Product and awareness and/or experiences of and with the issues described.

## Parties

46. Plaintiff Amber Knautz is a citizen of Freeport, Stephenson County, Illinois.

47. Defendant Walmart Inc. is a Delaware corporation with a principal place of business in Bentonville, Benton County, Arkansas.

48. Walmart is an American multinational retail corporation that operates a chain of over 5,000 supercenters throughout the nation, selling everything from furniture to groceries.

49. While Walmart sells leading national brands, it also sells a large number of products under one of its private label brands, Great Value.

50. Private label products are made by third-party manufacturers and sold under the

name of the retailer, or its sub-brands.

51. Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

52. Products under the Great Value brand have an industry-wide reputation for quality and value.

53. In releasing products under the Great Value brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

54. Defendant is able to get national brands to produce its private label items due its loyal customer base and tough negotiating.

55. That Great Value branded products met this high bar was proven by focus groups, which rated them above the name brand equivalent.

56. Private label products generate higher profits for retailers because national brands spend significantly more on marketing, contributing to their higher prices.

57. A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands are good alternatives to national brands, and more than 60 percent consider them to be just as good."

58. Private label products under the Great Value brand benefit by their association with consumers' appreciation for the Walmart brand as a whole.

59. The development of private label items is a growth area for Walmart, as they select only top suppliers to develop and produce Great Value products.

60. These facts show a company with a significant amount of goodwill and equity when it comes to consumer purchasing.

61. Plaintiff purchased the Product on one or more occasions within the statutes of

8

limitations for each cause of action alleged, at Defendant's stores, at locations such as 2545 Il Route 26 S, Freeport, IL 61032, between March and April 2022, among other times.

62. Plaintiff bought the Product because she believed and expected the Product contained cream, a dairy ingredient because that is what the representations and omissions said and implied, on the front label and/or the absence of any reference or statement elsewhere on the Product.

63. Plaintiff relied on the words, terms coloring, descriptions, layout, placement, packaging, hang tags, and/or images on the Product, on the labeling, statements, omissions, claims, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

64. Plaintiff bought the Product at or exceeding the above-referenced price.

65. Plaintiff would not have purchased the Product if she knew the representations and omissions were false and misleading or would have paid less for it.

66. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, requirements, instructions, features, and/or components.

67. The Product was worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

## Class Allegations

68. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Illinois Class:** All persons in the State of Illinois who purchased the Product during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the States of North Dakota, Texas, West Virginia, Virginia, Kentucky, New Mexico, Oklahoma, Utah, Nebraska, South Carolina, Kansas, and Wyoming who purchased the Product during the statutes of

9

limitations for each cause of action alleged.

69. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

70. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

71. Plaintiff is an adequate representative because her interests do not conflict with other members.

72. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

73. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

74. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

<u>Illinois Consumer Fraud and Deceptive Business Practices Act
("ICFA"), 815 ILCS 505/1, et seq.</u>

(Consumer Protection Statute)

75. Plaintiff incorporates by reference all preceding paragraphs.

76. Plaintiff believed the Product contained cream, understood as a dairy ingredient.

77. Defendant's false, misleading, and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

78. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

79. Plaintiff relied on the representations and omissions to believe the Product contained

cream, understood as a dairy ingredient.

80. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

81. Plaintiff seeks class-wide injunctive relief because the practices continue.

## Violation of State Consumer Fraud Acts

### (On Behalf of the Consumer Fraud Multi-State Class)

82. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

83. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

84. Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct.

85. As a result of Defendant's use of artifice, and unfair or deceptive acts or business practices, the members of the Consumer Fraud Multi-State Class sustained damages.

86. Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

## Breaches of Express Warranty, Implied Warranty of Merchantability/Fitness for a Particular Purpose and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

87. The Product was manufactured, identified, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff that it contained cream, understood as a dairy ingredient.

88. Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions distributed to resellers, and targeted digital advertising.

89. Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

90. Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant that it contained cream, understood as a dairy ingredient.

91. Defendant's representations affirmed and promised that the Product contained cream, understood as a dairy ingredient.

92. Defendant described the Product so Plaintiff believed it contained cream, understood as a dairy ingredient, which became part of the basis of the bargain that it would conform to its affirmations and promises.

93. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

94. This duty is based on Defendant's outsized role in the market for this type of Product, a trusted company known for its high-quality products.

95. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

96. Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

97. Plaintiff hereby provides notice to Defendant that it breached the express and implied warranties associated with the Product.

98. Defendant received notice and should have been aware of these issues due to

complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

99. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

100. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label, because it was marketed as if it contained cream, a dairy ingredient.

101. The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because she expected it contained cream, a dairy ingredient, and she relied on Defendant's skill and judgment to select or furnish such a suitable product.

102. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

103. Defendant had a duty to truthfully represent the Product, which it breached.

104. This duty was non-delegable, based on Defendant's position, holding itself out as having special knowledge and experience in this area, a trusted company, known for its transparent labeling, and its commitment to putting customers first.

105. Defendant's representations and omissions regarding the Product went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency and putting customers first, that it has been known for.

106. These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

107. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

108. Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

109. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

## Fraud

110. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it contained cream, understood as a dairy ingredient.

111. The records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity and deception, through statements and omissions.

112. Defendant knew of the issues described here yet did not address them.

113. Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

## Unjust Enrichment

114. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

## Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the Class;

14

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the Class pursuant to applicable laws;

4. Restitution and disgorgement for members of the Class pursuant to applicable laws;

5. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

6. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

7. Other and further relief as the Court deems just and proper.

Dated: July 1, 2022

Respectfully submitted,

/s/Spencer Sheehan
Sheehan & Associates, P.C.
Spencer Sheehan
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com